IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs November 4, 2025

## IN RE GIAVANNA K.

**Appeal from the Chancery Court for Hawkins County**
**No. 37CH1-2024-AD-32      Douglas T. Jenkins, Chancellor**

_____

### No. E2025-00508-COA-R3-PT

_____

In this parental termination case, the trial court found that one ground for termination of the mother's parental rights had been proven by clear and convincing evidence but failed to make findings of fact to support this conclusion. We vacate and remand for specific findings of fact and conclusions of law as required by statute.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Vacated and Remanded**

ANDY D. BENNETT, J., delivered the opinion of the Court, in which THOMAS R. FRIERSON, II, and CARMA DENNIS MCGEE, JJ., joined.

Deborah Annette Yeomans-Barton, Kingsport, Tennessee, for the appellant.

Caleb S. Bunch, Morristown, Tennessee, for the appellee, Christina C.

Jonathan Skrmetti, Attorney General and Reporter, and Jason R. Trautwein, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

### OPINION

#### FACTUAL AND PROCEDURAL BACKGROUND

Giovanna K. ("the child") was born in June 2021 to Christina C. ("Mother") and Brandon K. ("Father"). The child was born with fetal alcohol syndrome. On August 14, 2022, the Department of Children's Services ("DCS" or "the Department") removed the child from her parents' care and took her into DCS custody.

In a dependency and neglect petition filed the following day, the Department alleged that it had received a referral based upon the following facts: Giavanna underwent heart

surgery in Nashville and was discharged from the hospital on August 13, 2022. The next morning, the parents left Nashville to return home. While stopped at a convenience store in Morristown, the parents got into an argument, and Father drove away with the child and left Mother behind. He later attempted to turn the vehicle around and drove into a ditch. Law enforcement officials were called to the scene of the accident, and Father was charged with driving under the influence ("DUI") and child endangerment. Officers located Mother and charged her with public intoxication. Both parents were arrested and incarcerated, and the child was hospitalized and transferred to temporary DCS custody. On August 18, 2022, the juvenile court adjudicated the child dependent and neglected and placed her in DCS custody. The court appointed Deborah Yeomans-Barton as the child's guardian ad litem ("GAL").

The child was considered medically fragile even before she was taken into DCS custody and saw approximately eight specialists, including a neurologist, a cardiologist, an ophthalmologist, a pulmonologist, a gastroenterologist, an ear-nose-and-throat specialist, and an audiologist. Once in DCS custody, the child was placed with a foster family. The foster mother took Giavanna to numerous medical appointments, including frequent visits with her primary care physician.

In October 2022, Mother was unemployed and entered into an agreement with the child support enforcement office to pay $10 a month in child support. Later, Mother obtained steady employment, and the Department's permanency plan required Mother to pay $25 a month in child support. From October 2022 to February 2025, Mother made child support payments at least once a month, and often more frequently. However, the amount garnished from her wages was less than the $25 per month required by her permanency plan.

The Department provided Mother with some services, including a psychological evaluation, and Mother completed many of her responsibilities under the permanency plan. Mother was permitted to have two supervised visits a month with Giavanna.

In September 2024, the GAL filed a petition to terminate the parental rights of Mother and Father[1] in chancery court. The petition alleged three grounds for the termination of Mother's parental rights: (1) failure to manifest an ability and willingness pursuant to Tenn. Code Ann. § 36-1-113(g)(14); (2) abandonment by failure to support pursuant to Tenn. Code Ann. § 36-1-113(g)(1); and (3) persistence of conditions pursuant to Tenn. Code Ann. § 36-1-113(g)(3)(A). The chancery court appointed Ms. Yeomans-Barton to act as the GAL in the termination proceedings.

---

[1] Father's parental rights were terminated by the chancery court and are not at issue in this appeal.

The termination proceedings were held on February 10, 2025. The court heard testimony from Mother; Samantha Whitmer, the visitation supervisor; the foster mother; and Valerie Couper, a family services worker. The Department was represented at the hearing and opposed the GAL's petition to terminate Mother's parental rights on the basis that the petition was premature.

The foster mother generally informed Mother of the child's "regularly scheduled" doctor's appointments. In addition, foster mother and Mother would exchange text messages with updates on Giavanna, including her medical appointments. In her testimony, Mother acknowledged that she often had not attended the child's medical appointments since Giavanna had been in DCS custody. She explained that she sometimes received little notice and that some specialist appointments were over two hours away. Mother was present for all of the child's surgeries. Mother stated that she would have been able to attend more appointments if her schedule had been taken into account. When asked to explain the foster mother's observation that Mother mostly remained quiet during the doctor's appointments when she attended, Mother attributed her quietness to the fact that the child was not in her care at the time of the appointments. Mother testified that she knew how to take care of Giavanna and had managed the appointments prior to the child's removal from her care.

The results of the psychological evaluation completed by Mother in August 2024 stated that her prognosis for effective parenting was "low to fair" without "demonstrated progress on permanency and treatment goals." The evaluator recommended that Mother participate in therapy, complete a sleep study, and undergo a psychiatric evaluation. At trial, Mother had not completed these recommendations. She testified that she did not have health insurance and was saving money to pay for these services. Mother had completed parenting classes, obtained and maintained stable housing, maintained a stable income, and completed parenting and alcohol and drug assessments.

Mother testified at trial that the child support enforcement office refused to increase her monthly garnishment amount (from $10 to $25) absent a court order to that effect. Mother also submitted bank records to show that, beginning in October 2024, she arranged for an additional $10 per month to be automatically deducted directly from her bank account for child support, bringing her total child support contribution up to $20 per month. She testified that her intention was "[j]ust to make sure that I always have it taken out, no matter if it's a paycheck or not, just so in case anything happens in the computer system at any of the jobs, at least I'm still paying child support."

During the period from May 3, 2024, through September 25, 2024, Mother attended five of the eight visits with Giavanna to which she was entitled. Two visits were canceled because Mother reported she did not have transportation because her vehicle needed repairs. In one instance, Mother failed to confirm 24 hours ahead of the visit as required by the supervising entity. Mother testified that she had been asking her attorney to seek weekly

(rather than bimonthly) visits but acknowledged that no petition seeking more visits or unsupervised visitation had been filed. At the last court date, however, Mother's attorney requested additional visits, and the court granted an additional visit each month.

Samantha Whitmer, a care coordinator with ChildHelp, supervised the visits between Mother and Giavanna. Ms. Whitmer testified that Mother brought toys, baby supplies, and food and drinks to the visits. Ms. Whitmer testified that she did not believe that Mother followed good parenting practices during the visits; she acknowledged that she did not assist Mother because she was not providing therapeutic visitation. In emails after multiple visits, however, Ms. Whitmer stated that Mother exhibited proper parenting and enforced rules with Giavanna.

The foster mother testified about her care of Giavanna for over two years and the strong bond that had developed between the child and her foster parents. She did not think that Mother displayed adequate interest in the child's welfare and recalled an instance when Mother declined to accompany the child to the hospital and, instead, took her dog to the vet. The foster mother testified that she could "go a week or two without hearing" from Mother.

Valerie Couper, a team leader at Youth Villages who supervised the primary caseworker, testified that Mother had complied with most of her responsibilities under the permanency plan. Mother passed regular drug tests; there was no alcohol screening. According to Ms. Couper, when a parent has progressed in the permanency plan to the degree Mother had, the typical next step would be to move to unsupervised visits and more visitation time. Ms. Couper did not think the Department had taken steps to move Mother's case forward and believed that the case should have been moved forward. She testified that the Department had failed to act appropriately and had provided Mother with "no guidance." Ms. Couper recommended therapeutic visitation and more classes to help Mother improve in her ability to properly care for Giavanna. Ms. Couper believed that Mother had "done everything that [she was] supposed to do" and that it was inappropriate to terminate her rights.

At the end of Ms. Couper's testimony, the court asked for the Department's position in the case. Ms. Couper stated that the Department wanted more time to give Mother the services she needed. She further opined that "there has not been enough work done to support this mother in being able to be in a state where she can support her child, and I don't know that that's fully her own fault."

A key part of the GAL's case in support of termination was the deposition testimony of the child's primary care physician, Dr. Stephanie Gorman, who had treated Giavanna since she was 15 months old and had seen Giavanna "at least 20-some times" within the year prior to the hearing. During the deposition, the GAL asked Dr. Gorman about the child's prognosis if the child was returned to Mother. Dr. Gorman responded:

[M]y conclusion would have to be drawn from what I have observed. . . . And what I have observed is a child who came in severely malnourished and neglected, not seeing her specialists, and I have observed a child [whose] biological mother has not been present for most of her visits. And if she has not done that in this amount of time . . . then it makes me concerned that she would not give her the adequate medical care that she needs to thrive or even live.

*Trial court decision*

In its final order, entered on March 18, 2025, the trial court denied the GAL's petition to terminate Mother's parental rights. Of the three termination grounds asserted against Mother, the trial court concluded that only one had been proven by clear and convincing evidence: that Mother had failed to manifest an ability and willingness to parent the child pursuant to Tenn. Code Ann. § 36-1-113(g)(14). The court then completed the best interest analysis and concluded that there was not clear and convincing evidence that it was in the child's best interest to terminate Mother's parental rights. Therefore, the trial court dismissed the termination petition against Mother. The GAL appealed.

STANDARDS GOVERNING PARENTAL TERMINATION CASES
AND STANDARD OF REVIEW

Under both the federal and state constitutions, a parent has a fundamental right to the care, custody, and control of his or her own child. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010) (citing *Troxel v. Granville*, 530 U.S. 57, 65 (2000)); *Nash-Putnam v. McCloud*, 921 S.W.2d 170, 174-75 (Tenn. 1996) (citing *Nale v. Robertson*, 871 S.W.2d 674, 678 (Tenn. 1994)). Although this right is fundamental, it is not absolute and may be terminated in certain situations. *In re Angela E.*, 303 S.W.3d at 250. Our legislature has identified "'those situations in which the state's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth grounds on which termination proceedings can be brought.'" *In re Jacobe M.J.*, 434 S.W.3d 565, 568 (Tenn. Ct. App. 2013) (quoting *In re W.B., IV.*, Nos. M2004-00999-COA-R3-PT, M2004-01572-COA-R3-PT, 2005 WL 1021618, at *7 (Tenn. Ct. App. Apr. 29, 2005)).

Tennessee Code Annotated section 36-1-113 provides the grounds and procedures for terminating parental rights. First, a petitioner seeking to terminate parental rights must prove that at least one ground for termination exists. Tenn. Code Ann. § 36-1-113(c)(1); *In re Angela E.*, 303 S.W.3d at 251. Second, a petitioner must prove that terminating parental rights is in the child's best interest. Tenn. Code Ann. § 36-1-113(c)(2); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).

The termination of a parent's rights is one of the most serious decisions courts make because "[t]erminating parental rights has the legal effect of reducing the parent to the role of a complete stranger," *In re W.B., IV*, 2005 WL 1021618, at *6, and of "'severing forever all legal rights and obligations of the parent or guardian.'" *Id.* (quoting Tenn. Code Ann. § 36-1-113(l)(1)). Consequently, a parent has a constitutional right to fundamentally fair procedures during termination proceedings. *In re Hannah C.*, No. M2016-02052-COA-R3-PT, 2018 WL 558522, at *2 (Tenn. Ct. App. Jan. 24, 2018) (citing *In re Carrington H.*, 483 S.W.3d 507, 522 (Tenn. 2016)).

Tennessee law ensures fundamental fairness in termination proceedings by requiring a heightened standard of proof—clear and convincing evidence. *See* Tenn. Code Ann. § 36-1-113(c)(1); *In re Carrington H.*, 483 S.W.3d at 522. Before a parent's rights may be terminated, a petitioner must prove both the grounds and the child's best interest by clear and convincing evidence. Tenn. Code Ann. § 36-1-113(c); *In re Valentine*, 79 S.W.3d at 546. "Clear and convincing evidence 'establishes that the truth of the facts asserted is highly probable, and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" *In re Serenity B.*, No. M2013-02685-COA-R3-PT, 2014 WL 2168553, at *2 (Tenn. Ct. App. May 21, 2014) (quoting *In re M.J.B.*, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004)).

We review the trial court's findings of fact de novo with a presumption of correctness unless the evidence preponderates otherwise. TENN. R. APP. P. 13(d); *In re Serenity B.*, 2014 WL 2168553, at *2. In light of the heightened standard of proof, we must then make our own determination "as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights." *In re Carrington H.*, 483 S.W.3d at 524 (citing *In re Bernard T.*, 319 S.W.3d 586, 596-97 (Tenn. 2010)). A trial court's determination "that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness." *Id.*

ANALYSIS

The trial court determined that the GAL had proven only one of the three grounds for termination alleged in the petition—namely, failure to manifest an ability and willingness to assume custody. Although none of the parties to this appeal argues that the trial court erred in finding that the GAL proved this ground, we must review the trial court's findings on the ground for termination. *See id.* at 525-26 (holding that "in an appeal from an order terminating parental rights the Court of Appeals must review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests, regardless of whether the parent challenges these findings on appeal").

Tennessee Code Annotated section 36-1-113(g)(14) authorizes a court to terminate a parent's rights when:

> A parent or guardian has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[.]

Tenn. Code Ann. § 36-1-113(g)(14).[2] This ground contains two essential prongs that must be proven by clear and convincing evidence. *In re Neveah M.*, 614 S.W.3d 659, 674 (Tenn. 2020). The first prong requires proof that "the parent or legal guardian failed to manifest an ability and willingness to personally assume legal and physical custody or financial responsibility of the child." *Id.* If the petitioner "proves by clear and convincing proof that a parent or guardian has failed to manifest *either* ability or willingness, then the first prong of the statute is satisfied." *Id.* at 677. Second, the petitioner must prove that placing the child in the parent's "legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child." *Id.* at 674. The risk of substantial harm must be "'a real hazard or danger that is not minor, trivial, or insignificant,'" and "'[w]hile the harm need not be inevitable, it must be sufficiently probable to prompt a reasonable person to believe that the harm will occur more likely than not.'" *In re Maya R.*, No. E2017-01634-COA-R3-PT, 2018 WL 1629930, at *8 (Tenn. Ct. App. Apr. 4, 2018) (quoting *Ray v. Ray*, 83 S.W.3d 726, 732 (Tenn. Ct. App. 2001)).

In a brief section of its final order, the trial court set out its findings regarding the failure to manifest ground with respect to both parents. The findings regarding Mother are as follows:

> 3. [Mother] has failed to manifest, by act or omissions, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child.
> 4. [Mother] does not have the ability to take the child back currently.
> 5. Placing the child in [Mother's] legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child.
> 6. The child has received excellent care in the foster home and are [sic] well bonded to their family.
> 7. The Guardian Ad Litem has proven, by clear and convincing evidence, the ground for termination contained in T.C.A. § 36-1-113(14) [sic] against [Mother].

---

[2] All citations to the Tennessee Code refer to the termination statutes in effect as of September 3, 2024, when the petition for termination was filed.

There are no other pertinent findings in the trial court's order.

The parental termination statutes require the trial court to "enter an order that makes specific findings of fact and conclusions of law." Tenn. Code Ann. § 36-1-113(k). The appellate courts require "'meticulous compliance'" with this statutory requirement. *In re Cartier H.*, No. M2022-01576-COA-R3-PT, 2023 WL 7158076, at *14 (Tenn. Ct. App. Oct. 31, 2023) (quoting *In re Maria B.S.*, No E2011-01784-COA-R3-PT, 2012 WL 1431244, at *3 (Tenn. Ct. App. Apr. 25, 2012)). Our Supreme Court has stated that, without appropriate findings of fact, "an appellate court cannot conduct a de novo review and the case must be remanded for the trial court to enter sufficient findings of fact and conclusions of law." *In re Bentley E.*, 703 S.W.3d 298, 303 (Tenn. 2024); *see also In re Dakari M.*, No. M2022-00365-COA-R3-PT, 2024 WL 1269860, at *5-6 (Tenn. Ct. App. Mar. 26, 2024) (vacating the termination of parental rights and remanding for specific findings of fact and conclusions of law regarding termination on the ground of failure to manifest); *In re Chayson D.*, 720 S.W.3d 123, 142 (Tenn. Ct. App. 2023) (vacating trial court's termination order in relation to failure to manifest due to absence of specific findings).

Unfortunately, the trial court's findings in this case are insufficient. The relevant portion of the trial court's order consists mostly of conclusory restatements of the statutory elements for termination due to failure to manifest. *See In re Bentley E.*, 703 S.W.3d at 304 (vacating the trial court's best interest determination as "not supported by factual findings" and "conclusory statements"). While the trial court's finding that the child is bonded to the foster parents is relevant, the trial court made no specific findings to support a determination that either of the statutory prongs has been established by clear and convincing evidence.

Because we are vacating and remanding regarding the only termination ground found by the trial court, we do not proceed to the second step of the termination analysis, whether termination of Mother's parental rights is in the child's best interests.[3] *In re Dakari*, 2024 WL 1269860, at *6.

CONCLUSION

The judgment of the trial court is vacated and remanded. Costs of this appeal are assessed against the appellant, the guardian ad litem, for which execution may issue if necessary.

/s/ Andy D. Bennett
ANDY D. BENNETT, JUDGE

---

[3] The trial court provided factual findings to support its conclusion that the GAL had not proven by clear and convincing evidence that termination of Mother's rights was in the child's best interest.